UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KUNAL KAPAI | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| UNIFIED BUSINESS TECHNOLOGIES, INC.; | § | |
| ADDON SERVICES, LLC: MICHELLE D'SOUZA; | § | |
| CANDACE PLANK; ALI SHAHEEN; | § | |
| MARYLOU BOSCARDIN; DEVIKA PAKKALA; and | § | |
| GEORGIA JOHNSON, | § | |
| *Defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, KUNAL KAPAI ("Plaintiff") complaining of Defendants UNIFIED BUSINESS

TECHNOLOGIES, INC. (UBT), ADDON SERVICES, LLC (ADDON), MICHELLE D'SOUZA, CANDACE PLANK,

ALI SHAHEEN, MARYLOU BOSCARDIN, DEVIKA PAKKALA, and GEORGIA JOHNSON ("collectively

Defendants"), and for causes of action would respectfully show the Court as follows

### I. INTRODUCTION:

1.01    The Plaintiff Kunal Kapai ("Kapai") was hired in January 2013 by UBT's CEO, Michelle

D'Souza ("Ms. D'Souza"), to serve as UBT's Senior Vice President of Operations. Plaintiff had a 12-

year, on-again-off-again sexual relationship with Ms. D'Souza. Ms. D'Souza served as Plaintiff's

immediate supervisor at UBT. Plaintiff's chief responsibility was to manage and operate UBT's

telecommunications division. Ms. D'Souza also compelled Plaintiff to work without pay as Chief

Operating Officer for a Section 8(a) Business Development company called Addon Services, LLC

(Addon). Ms. D'Souza exerted control over Addon Services, LLC, which was owned by a former UBT

employee. Plaintiff ended his sexual relationship with Ms. D'Souza on or about July 2015. In retaliation,

Ms. D'Souza sexually harassed and retaliated against Plaintiff. Ms. D'Souza stripped Plaintiff of job

duties, responsibility, and decision-making authority, and unltimately terminated him. Such action was

based on his sex (male), in violation of Title VII, as retaliation for terminating his sexual relationship with Ms. D'Souza. Untruthful factual statements made by Defendants were also instrumental in Plaintiff's termination, thereby giving rise to state tort claims for defamation, tortious interference with contract and conspiracy. Addon never paid Plaintiff for his work performed for the company although Addon received the benefit of such work. UBT breached its contract with Plaintiff because it failed to pay him 30-days' notice after terminating him without cause.

## II. PARTIES:

2.01    The Plaintiff Kunal Kapai is a natural citizen who resides at 8727 Isaac Street, Plano Texas 75024. He is a citizen of the United States.

2.02    The Defendant Unified Business Technologies, Inc. is a foreign corporation doing business in Texas. It may be served by delivering a copy of this Complaint and a summons to Michelle D'Souza, Unified Business Technologies, Inc. 353 Indusco Ct., Suite C, Troy Michigan 48083.

2.03    The Defendant Addon Services, LLC is a foreign limited liability corporation doing business in Texas. It may be served by delivering a copy of this Complaint and a summons to its member Prita Abraham, Addon Services, LLC, 27789 Mound Road, Suite 200, Warren, Michigan 48092.

2.04    The Defendant Michelle D'Souza is a citizen of the United States who is being sued in this action in her individual capacity. At all times material to this action, she was employed by UBT as an employee in the position of Chief Executive Officer (CEO) and she was the 100-percent sole shareholder of UBT.  She may be served by delivering a copy of this Complaint and a summons at her place of business at UBT Inc. 353 Indusco Ct. Suite C, Troy, MI 48083.

2.05    The Defendant Candace Plank is a citizen of the United States who is being sued in this action in her individual capacity. At all times material to this action, Mosaic Consulting and services the company owned by Candace Plank was contracted (1099) by UBT and Addon Services LLC n the position of Manager of Human Resources., Accounting and Finance. She may be served by delivering a copy of this Complaint and a summons at her address at 432 Woodland Dr Dillsburg, PA 17019.

2.06     The Defendant Ali Shaheen is a citizen of the United States who is being sued in this action in his individual capacity. At all times material to this action, he was employed by UBT as an employee in the position of Vice President of Business Operation. He may be served by delivering a copy of this Complaint and a summons at 790 Twin Buttes Dr., Prosper, TX 75078

2.07     The Defendant Marylou Boscardin is a citizen of the United States who is being sued in this action in her individual capacity. At all times material to this action, she was employed by UBT as an employee in the position of Project Manager. She may be served by delivering a copy of this Complaint and a summons at her address at 435 Maywood Ct., Mechanicsburg, PA 17050.

2.08     The Defendant Devika Pakkala is a citizen of the United States who is being sued in this action in his individual capacity. At all times material to this action, she was employed by UBT as an employee in the position of Accounts Receivable. She may be served by delivering a copy of this Complaint and a summons at her place of business at UBT Inc. 353 Indusco Ct. Suite C, Troy, MI 48083.

2.09     The Defendant Georgia Johnson is a citizen of the United States who is being sued in this action in her individual capacity. At all times material to this action, she was employed by UBT. She may be served by delivering a copy of this Complaint and a summons at her place of business at UBT Inc. 353 Indusco Ct. Suite C, Troy, MI 48083.

### III. JURISDICTION AND VENUE:

3.01     Pursuant to 28 U.S.C. 1331, this Court has original jurisdiction of this action, which includes claims arising under the laws of the United States, including Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.

3.02     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction against the state law claims brought against Defendants since such claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.03     Venue for the causes of action arising under Title VII lies in the United States District Court for the Eastern District of Texas because this District is where the alleged unlawful employment practices alleged in this action occurred. 42 U.S.C. §2002e-5(f)(3) Venue for all causes of action alleged herein otherwise lies in the Eastern District of Texas, because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District. 28 U.S.C. §1391.

### IV. ADMINISTRATIVE PREREQUISITES:

4.01     All administrative prerequisites to filing suit under Title VII have been fulfilled. On June 27, 2016. Plaintiff filed a timely Charge of Discrimination (No. 450-2016-03346) with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination, age discrimination and retaliation. On July 18, 2019, the EEOC issued Plaintiff a Right-to-Sue Notice.

### V. BACKGROUND FACTS

5.01     Plaintiff is male.

5.02     Plaintiff was hired by UBT on January 25, 2013, as Senior Vice President of Operations. UBT's CEO Michelle D'Souza hired Plaintiff. Ms. D'Souza served as Plaintiffs immediate supervisor.

5.03     Plaintiff signed a contract with UBT, which is attached as EXHIBIT 1. The contract states 2012, but the correct date of hire is January 2013.

5.04     Plaintiff was continuously employed by UBT until he was terminated on May 10, 2016. At the time of his termination, Plaintiff served as Chief Operating Office of UBT.

5.05     Plaintiff received written notice of his termination that does not state any cause for termination. EXHIBIT 2.

5.06     Ms. D'Souza knew Plaintiff for more 12 years when she hired him at UBT.

5.07     Plaintiff and Ms. D'Souza were involved in an on-again-off-again sexual relationship before Ms. D'Souza hired Plaintiff at UBT.

5.08     Plaintiff terminated the sexual relationship with Ms. D'Souza in about July 2015.

5.09    UBT provides engineering, IT, wireless telecommunications, and manufacturing solutions. One of UBT's largest clients is the United States government, including the Department of Defense.

5.10    As of January 2013, Plaintiff had developed an international professional reputation in the telecommunications industry. He had worked for some of the largest international companies in the industry.

5.11    When Plaintiff was hired at UBT, Plaintiff's professional reputation commanded the respect of UBT employees, vendors, competitors, and United States government officials who awarded contracts to UBT.

5.12    Plaintiff's chief responsibility at UBT was to manage and operate UBT's telecommunications division and information technology services business for the United States' Department of Defense and UBT's private sector customers.

5.13    Plaintiff possessed no decision-making authority over UBT's financial or accounting reporting.

5.14    Plaintiff's Employment Agreement with UBT provided for a base salary of $155,000 (plus benefits) and additional compensation based on net profits generated by Plaintiff for UBT. EXHIBIT 2.

5.15    Ms. D'Souza also represented to Plaintiff when he joined UBT that she would finance and fund his company SCSS, LLC to develop its own telecommunication business in cooperation with UBT and other companies over the course of the next few years.

5.16    Ms. D'Souza also promised Plaintiff a signing bonus when he joined UBT as Senior Vice President of Operations.

5.17    On May 17, 2013, Ms. D'Souza arranged for two companies, Amvet Solutions, Inc. and NSOJ Inc, to pay to Plaintiff's company SCSS, LLC a total of $101,000.

5.18     At the time, Ms. D'Souza requested that Plaintiff have SCSS, LLC invest $97,000 into purchasing title to a property located at 138 Conda Lane, Oxford, Michigan 48371. Plaintiff did as he was instructed by Ms. D'Souza.

5.19     In about mid-2013, Ms. D'Souza instructed Plaintiff to expand UBT's telecommunication operations internationally into Mexico, Canada, and Bahrain.

5.20     As a result, UBT created UBT DE Mexico S.A. DE C.V. on June 21, 2013. UBT at the direction of Ms. D'Souza issued to Plaintiff one-percent ownership of the UBT Mexican entity.

5.21     The company in Bahrain never got set up because Ms. D'Souza mispresented that she possessed a master's degree, which was a Bahrain government requirement to set up the company in Bahrain.

5.22     After hiring Plaintiff at UBT, Ms. D'Souza demanded Plaintiff also represent himself as the Chief Operations Officer (COO) of a company called Addon Services, LLC (Addon).

5.23     Addon issued to Plaintiff an Addon work email and business cards identifying Plaintiff as the company's Chief Operating Officer at the instruction of Ms. D'Souza and Ms. Abraham.

5.24     On paper, the majority owner of Addon is Ms. Abraham. Ms. Abraham is a former employee of UBT.

5.25     Addon is certified as a participant in the U.S. Small Business 8(a) Business Development program.

5.26     UBT lost its 8(a) certification shortly before Plaintiff joined UBT. UBT had been in the 8(a) program for the maximum period allowed.

5.27     Addon has a convoluted financial structure with UBT. Some of the money to finance Addon came from UBT, Ms. D'Souza, or UBT and D'Souza affiliated companies.

5.28     Addon subcontracts work awarded to it by the United States government to UBT.

5.29     Plaintiff continuously voiced to Ms. D'Souza and Ms. Abraham that he objected to the relationship between Addon and UBT and Ms. D'Souza's control and influence over the company.

5.30    Plaintiff continuously also objected to Ms. D'Souza and Ms. Abraham of unethical business practices of UBT and Addon, including specifically using UBT employees' such as Plaintiff and others to pose as Addon employees in interacting, business development and project execution of contracts awarded by various United States government agencies.

5.31    Plaintiff verbally told UBT, Ms. D' Souza, and Ms. Abraham on many occasions during his employment that he protested having anything to do with Addon and protested that  Addon was not paying him for his work performed for the company.

5.32    Ms. D'Souza and Ms. Abraham, however, demanded that Plaintiff communicate on behalf of Addon as its COO with government agencies, customers and potential customers of Addon.

5.33    Ms. D'Souza demanded that Plaintiff on behalf of Addon canvassed for business; negotiated on project awards; oversaw and directed proposal submissions and preparations for contract awards; and worked with a few employees of Addon on project preparation and project execution.

5.34    Ms. D'Souza required Plaintiff to report directly to Addon's majority owner Ms. Abraham on issues both for business development, operations and pre-operative preparation.

5.35    Plaintiff objected to Ms. D'Souza and Ms. Abraham about scores of unethical and corrupt business practices conducted by Addon at the direction of Ms. D'Souza and Ms. Abraham.

5.36    Plaintiff regularly demanded to be paid for his work as the COO of Addon. Plaintiff was never paid by Addon despite more than two years of work as its COO.

5.37    Plaintiff ceased working for Addon when he was terminated from UBT on May 10, 2016. Addon withdrew his access to his email account and its computer systems and file storage systems.

5.38    After their sexual relationship ended, Ms. D'Souza became angry with Plaintiff, and began to undermine his decision-making authority at both UBT and Addon.

5.39    After Plaintiff terminated his sexual relationship with Ms. D'Souza, Ms. D'Souza stripped Plaintiff of several of his job responsibilities and decision-making authorities, including oversight and management of UBT's profitable information technology business.

5.40   Ms. D'Souza initiated a systematic campaign of retaliation against Plaintiff among UBT employees.

5.41   After Plaintiff terminated his sexual relationship with Ms. D'Souza, other UBT employees at the direction of Ms. D'Souza began failing to timely deliver – or not deliver at all – necessary management financial information on the projects required for Plaintiff to perform his job for UBT and Addon.

5.42   Ms. D'Souza caused UBT employees to file false charges and complaints against Plaintiff.

5.43   For example, after Plaintiff terminated his sexual relationship with Ms. D'Souza, Defendant Candace Plank began refusing to take direction from Plaintiff, including timely provide to Plaintiff monthly financial reports related to the business lines he managed, which interfered with his ability to perform his job duties.

5.44   Ms. Plank acted as UBT's and Addon's designated Finance Controller and head of Human Resources.

5.45   Ms. Plank, however, was a 1099 independent contractor for UBT and Addon. Ms. Plank owns Mosaic Consulting and Services.

5.46   Ms. Plank worked with Plaintiff for more than seven years at their previous employer. Ms. Plank owed Plaintiff a substantial sum of money.

5.47   Ms. D'Souza's retaliation because he terminated their sexual relationship caused Plaintiff to suffer tangible and intangible financial losses and negatively affected his overall job performance and compensation at UBT.

5.48   Plaintiff raised with Ms. D'Souza her sudden onset of disparate treatment and lack of transparency at UBT after he terminated the sexual relationship with her.

5.49   Ms. D'Souza became further irate toward Plaintiff, exclaiming: "It's my company, I pay your compensation, and don't you forget that."

5.50    On May 9, 2016, after more than a year of harassment and retaliation by Ms. D'Souza, Ms. D'Souza demand that Plaintiff attend a 45-minute, face-to-face meeting at the Plano Texas office. Ms. D'Souza flew from Detroit to Dallas to attend this meeting with Plaintiff.

5.51    In the meeting, Ms. D'Souza berated, threatened, and humiliated Plaintiff regarding his ongoing objections to (a) the unethical business practices at UBT and Addon, (b) the retaliation against him by Ms. D'Souza and UBT staff after he terminated the sexual relationship with Ms. D'Souza, and (c) his refusal  to pay to Ms. D'Souza $101,000, which was the signing bonus paid to his company SCSS, LLC and used to buy the property.

5.52    In the meeting, Ms. D'Souza threatened Plaintiff. Ms. D'Souza told Plaintiff she possessed "top secret security clearances" and "knew powerful people" who would "destroy him professionally."

5.53    Ms. D'Souza further accused Plaintiff of being a criminal. Ms. D'Souza threatened to report Plaintiff to the police.

5.54    After the meeting, the Plaintiff feared for his personal safety. The Plaintiff also feared for his professional reputation.

5.55    The Plaintiff, however, made clear to Ms. D'Souza that her retaliation against him because he ended their sexual relationship would not intimidate him into silence about the ongoing unethical business practices of UBT and Addon.

5.56    Ms. D'Souza terminated Plaintiff's employment with UBT the next day on May 10, 2016.

5.57    On May 10, 2016, Addon also terminated Plaintiff's access to his Addon email and Addon's computer systems and electronic file storage systems.

## VI. COUNT 1: SEX DISCRIMINATION UNDER TITLE VII (UBT)

6.01    Plaintiff incorporates, and realleges, in full, paragraphs 1.01 through and 5.57 of this Original Complaint.

6.02     At all times material to this action, Plaintiff was an employee within the meaning of Title VII and belongs to a class protected by the statute. 42 U.S.C. §2000e(f)**.**

6.03     At all times material to this action, UBT was an employer within the meaning of Title VII. 42 U.S.C. §2000e(b). UBT employed fifteen (15) or more employees within the current calendar year.

6.04     Plaintiff suffered the following adverse employment actions by UBT:

(a)     UBT treated him differently than other similarly situated female employees when they terminated him as Senior Vice President of Operations on May 10, 2016 allegedly because of the alleged claims against him by his former employer GTL (USA), Inc.

(b)     UBT ratified or recklessly accepted at face value false statements by its current and former employees, among others, including Defendants Michelle D'Souza, Georgia Johnson, Candace Plank, Ali Shaheen, Marylou Boscardin, and Devika Pakkala, as to an alleged pattern of predatory financial misconduct and physical and sexual harassment of UBT's staff.

(c)     UBT ratified or recklessly accepted at face value a sham investigation by Defendant D'Souza as to allegations of misconduct by Plaintiff, which included allegations of sexual harassment, improper conduct at UBT, improper conduct at this former employer, and filing of complaints against Plaintiff.

(d)     UBT terminated him as Senior Vice President of Operation of the company on May 10, 2016.

(e)     UBT failed to reinstate him after May 10, 2016.

6.05     Through these adverse employment actions, UBT intentionally discriminated against Plaintiff because of his sex (male.) Without limitation, such intentional discrimination was evidenced by:

     (a)     Plaintiff's termination for disputed behavior less egregious than undisputed behavior by female employees of UBT.

     (b)     The weaponization of allegations of sexual harassment and discrimination through the ratification or acceptance at face value of false allegations against him, but the marginalization of truthful allegations made against female UBT employees.

     (c)     The sham investigation conducted by its agents, Ms. D'Souza, which never questioned the veracity of the allegations of predatory financial misconduct and physical and sexual harassment of UBT staff made against Plaintiff.

6.06    UBT engaged in the discrimination alleged under this Count with malice or reckless indifference to the federally protected rights of Plaintiff. Plaintiff is therefore entitled to receive and seeks the recovery of punitive damages. 42 U.S.C. §1981a(b)(1).

6.07    As a direct and proximate result of UBT's violation of Title VII, Plaintiff lost his employment as Senior Vice President of Operations to which he now seeks reinstatement. Alternatively, Plaintiff seeks reinstatement to a comparable position with reinstatement of benefits, including all applicable credit for the period between May 10, 2016, and his reinstatement.

6.08    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has suffered pecuniary losses, including lost back pay, front pay, and other past and future losses.

6.09    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has also suffered non-pecuniary losses, including emotional pain and suffering, inconvenience, loss of enjoyment of life, and other losses.

6.10    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has been required to obtain retain legal counsel to prosecute this action Accordingly, Plaintiff has incurred attorney's fees which are reimbursable under Title VII. 42 U.S.C. §2000e-5(k).

## VII. COUNT 3: RETALIATION UNDER TITLE VII (UBT)

7.01    Plaintiff incorporates, and realleges, in full, paragraphs 1.01 through and 6.10 of this Original Complaint.

7.02    On or about July 2015, Plaintiff engaged in protected opposition to an employment practice made unlawful by Title VII. 42 U.S.C. 2000e-3(a).

7.03    Through the adverse employment actions alleged in this Original Complaint, UBT intentionally retaliated against Plaintiff because of his protected opposition.

7.04    UBT engaged in the discrimination alleged under this Count with malice or reckless indifference to the federally protected rights of Plaintiff. Plaintiff is therefore entitled to receive and seeks the recovery of punitive damages. 42 U.S.C. §1981a(b)(1).

7.05    As a direct and proximate result of UBT's violation of Title VII, Plaintiff lost his employment as Chief Operations Officer to which he now seeks reinstatement. Alternatively, Plaintiff seeks reinstatement to a comparable position with reinstatement of benefits, including all applicable credit for the period between May 10, 2016, and his reinstatement.

7.06    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has suffered pecuniary losses, including lost back pay, front pay, and other past and future losses.

7.07    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has also suffered non-pecuniary losses, including emotional pain and suffering, inconvenience, loss of enjoyment of life, and other losses.

7.08    As a direct and proximate result of UBT's violation of Title VII, Plaintiff has been required to obtain retain legal counsel to prosecute this action. Accordingly, Plaintiff has incurred attorney's fees which are reimbursable under Title VII. 42 U.S.C. §2000e-5(k).

## VIII. DEFAMATION: MICHELLE D'SOUZA, CANDACE PLANK, ALI SHAHEEN, MARYLOU BOSCARDIN, DEVIKA PAKKALA, AND GEORGIA JOHNSON

8.01     Plaintiff incorporates, and realleges, in full, paragraphs 1.01 through and 7.08 of this Original Complaint.

8.02     Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson published oral and/or written false statements of fact to UBT regarding Plaintiff's conduct as an employee of UBT. These statements constituted defamation of Plaintiff.

8.03     Defendants Michelle D'Souza published oral and/or written statements of fact to UBT regarding her alleged interview of Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson and facts allegedly obtained during her investigation of Plaintiff. These statements constituted defamation of Plaintiff.

8.04     Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson published oral and/or written false statements of fact to UBT that (a) constituted injury to Plaintiff's office, business, profession or calling, (b) imputed sexual misconduct, and (c) criminal conduct. These statements constituted defamation per se of Plaintiff.

8.05     Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson published the oral and/or written defamatory statements alleged under this Count with knowledge of their falsity or with reckless disregard for their truth.

8.06     As a direct and proximate result of the defamation alleged under this Count, Plaintiff was terminated by UBT and was unable to secure new employment for almost two years and serious damage to his public reputation. Plaintiff has thus suffered pecuniary losses, including lost back pay, front pay, and other past and future losses.

8.07     As a direct and proximate result of the defamation alleged under this Count, Plaintiff has also suffered non-pecuniary losses, including emotional pain and suffering, inconvenience, loss of enjoyment of life, and other losses.

8.08     Defendants engaged in the conduct alleged under this Count with malice and with

reckless disregard for the rights of Plaintiff under Texas law. Plaintiff is therefore entitled to receive and seeks the recovery of punitive damages.

### IX. TORTIOUS INTERFERENCE WITH CONTRACT: MICHELLE D'SOUZA, CANDACE PLANK, ALI SHAHEEN, MARYLOU BOSCARDIN, DEVIKA PAKKALA, AND GEORGIA JOHNSON

9.01     Plaintiff incorporates, and realleges, in full, paragraphs 1.01 through and 8.08 of this Original Complaint.

9.02     Plaintiff had a contract of employment with UBT.

9.03     Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson engaged in acts of willful and intentional interference with Plaintiff's contract with UBT. Such acts included, without limitation, the publication to UBT of false oral and/or written statements regarding Plaintiff, and the conduct of a sham investigation regarding Plaintiff.

9.04     As a direct and proximate result of the defamation alleged under this Count, UBT terminated its contract with Plaintiff. Plaintiff has thus suffered pecuniary losses, including lost back pay, front pay, and other past and future losses.

9.05     As a direct and proximate result of the defamation alleged under this Count, Plaintiff has also suffered non-pecuniary losses, including emotional pain and suffering, inconvenience, loss of enjoyment of life, and other losses.

9.06     Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson engaged in the conduct alleged under this Count with malice and with reckless disregard for the rights of Plaintiff under Texas law. Plaintiff is therefore entitled to receive and seeks the recovery of punitive damages.

### X. CONSPIRACY: MICHELLE D'SOUZA, CANDACE PLANK, ALI SHAHEEN, MARYLOU BOSCARDIN, DEVIKA PAKKALA, AND GEORGIA JOHNSON

10.01     Plaintiff incorporates, and realleges, in full, paragraphs 1.1 through 9.06 of this Original Complaint.

10.02    Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson acted in combination in pursuit of a conspiracy against Plaintiff.

10.03    Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson each had a specific intent to agree with the other Defendants to accomplish something unlawful or to accomplish something lawful by unlawful means. Specifically, they sought to end the employment of Plaintiff with UBT through defamatory statements regarding Plaintiff and through tortious interference with Plaintiff's contract with UBT

10.04    Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson each had a meeting of minds with the other Defendants on the object or course of action with respect to Plaintiff. This object or course of action included, without limitation, the publication to UBT of false statements of fact regarding Plaintiff and the conduct of a sham investigation regarding Plaintiff.

10.05    Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson did each engage in one or more overt actions in pursuit of the object or course of action alleged under this Count. These overt actions included the publication to UBT of false statements of fact regarding Plaintiff and the conduct of a sham investigation regarding Plaintiff.

10.06    As a direct and proximate result of the conspiracy alleged under this Count, Plaintiff was terminated by UBT and has been unable to secure new employment. Plaintiff has thus suffered pecuniary losses, including lost back pay, front pay, and other past and future losses.

10.07    As a direct and proximate result of the conspiracy alleged under this Count, Plaintiff has also suffered non-pecuniary losses, including emotional pain and suffering, inconvenience, loss of enjoyment of life, and other losses.

10.08    Defendants Michelle D'Souza, Candace Plank, Ali Shaheen, Marylou Boscardin, Devika Pakkala, and Georgia Johnson engaged in the conduct alleged under this Count with malice and with

reckless disregard for the rights of Plaintiff under Texas law. Plaintiff is therefore entitled to receive and seeks the recovery of punitive damages.

## XI. QUANTUM MERIUT: ADDON SERVICES, LLC

11.01    Plaintiff incorporates, and realleges, in full, paragraphs 1.1 through 10.08 of this Original Complaint.

11.02    Plaintiff worked for Addon Services, LLC as its Chief Operating Officer from approximately March 2013 until May 10, 2016.

11.03    Addon held out Plaintiff as its COO.

11.04    Plaintiffs supervisor UBT's CEO Ms. D'Souza with who he was engaged in a sexual relationship demanded that he work as Addon's CEO as a condition of his employment with UBT.

11.05    Plaintiff performed his work for Addon as its COO with an expectation he would be paid reasonable compensation for the work Plaintiff performed as Addon's COO.

11.06    Addon received the benefits of Plaintiffs' services as the company's COO.

11.07    Addon did not expect Plaintiff to work as its COO for nothing. Addon expected to pay Plaintiff reasonable compensation for the work he performed n behalf of the company as its COO.

11.08    Plaintiff repeatedly objected to Ms. D'Souza and Ms. Abraham that he must be paid for his work as the COO of Addon.

11.09    Addon never paid Plaintiff for the work that he performed for Addon as its COO.

11.10    As a result, Plaintiff is entitled to reasonable compensation for his work as Addon's COO from March 2013 to May 2016

## XII. BREACH OF CONTRACT: UBT, INC.

12.01    Plaintiff incorporates, and realleges, in full, paragraphs 1.1 through 11.10 of this Original Complaint.

12.02    Plaintiff signed an Employment Agreement contract with UBT. EXHIBIT 1, *Employment Agreement.*

12.03    The Employment Agreement provides the following in the event of termination without cause:

### 3.2    TERMINATION WITHOUT CAUSE

a.    Either Employer or Employee may terminate the employment relationship on 30 days' written notice to the other of the desire to end the employment relationship between the parties.

EXHIBIT 1, *Employment Agreement, Section 3. Termination*, p. 2.

12.04    UBT terminated Plaintiff without cause.

12.05    UBT failed to give Plaintiff 30-days written notice prior to terminating him without cause.

12.06    UBT failed to pay Plaintiff for 30 days following his notice of termination

12.07    As a result, UBT owes Plaintiff 30 days of salary.

12.08    As a direct and proximate result of UBT's breach of its contract with Plaintiff, Plaintiff has been required to obtain retain legal counsel to prosecute this action. Accordingly, Plaintiff has incurred attorney's fees which are reimbursable under Texas Business & Commerce Code Sec. 38.001, et. seq.

## XIII. JURY DEMAND: (ALLDEFENDANTS)

13.01    Plaintiff demands trial by jury for all claims herein.

## XIV. PRAYER:

FOR THE REASONS ABOVE, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final trial, Plaintiff have and recover the following relief against Defendants:

(1)    Judgment for actual damages in the amount of past and future lost earnings and benefits and damages to past and future earnings capacity and past and future medical expenses;

(2)    Judgment for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses;

(3)    Damages for past and future mental anguish and emotional distress and physical distress;

(4)    Exemplary damages in an amount to be determined by the trier of fact;

(5)     An award of liquidated and/or statutory damages in an amount equal to all lost wages, salary, employment benefits, and other compensation lost as a result of UBT wrongful conduct in the amount to be proven at trial;

(6)     An order by the Court reinstating Plaintiff as an employee of UBT and Addon in a similar position with similar pay and benefits to that from which he was wrongfully discharged, or, in the alternative, future pay in an amount to be determined by the Court;

(7)     Prejudgment and post-judgment interest at the maximum legal rate;

(8)     Attorney's fees;

(9)     Expert fees;

(10)    All costs of court; and

(11)    Such other and further relief to which Plaintiff may be justly entitled.


Dated: October 10, 2019.


                                        RESPECTFULLY SUBMITTED,


                                        ____/S/ TIMOTHY B. SOEFJE_____
                                        **TIMOTHY B. SOEFJE**
                                        STATE BAR NO.: 00791700
                                        **SELTZER CHADWICK SOEFJE & LADIK, PLLC**
                                        THE STAR IN FRISCO
                                        5 COWBOYS WAY, SUITE 300
                                        FRISCO, TEXAS 75034
                                        TELEPHONE: (972) 922-8866
                                        TELECOPIER: (972) 767-4246
                                        EMAIL: TSOEFJE@REALCLEARCOUNSEL.COM
                                        **ATTORNEYS FOR PLAINTIFF**



## UNIFIED BUSINESS TECHNOLOGIES

December 03, 2012

Mr. Kunal Kapai
8727 Isaac Street
Plano, TX 75024

Dear Kunal Kapai:

Welcome to Unified Business Technologies Inc. (UBT).  We are thrilled that you have joined one of the best companies in the country! As a new member of UBT you are now part of an outstanding company rich in tradition and values.

I am pleased to offer you the position, Sr. Vice President of Operations at UBT. The offered position is full-time beginning on January 03, 2013, at an annual base salary of $155,000 plus benefits. You will be paid bi-weekly.

In addition, for all business generated due to your efforts, we will pay you the following;
- 10% of net profit on the telecommunication industry
- 5% of net profit on any other business

You may indicate acceptance of this position by signing below and returning a signed copy of this letter. I would appreciate receiving a response to this offer by December 07, 2012. Please feel free to call me if you have any questions about the position, the company, or the terms of this offer.

Once again, welcome to UBT. We are delighted to have you join our team and I look forward to working with you.

Sincerely,

Roy Riggleman
Director of Recruiting
Unified Business Technologies Inc.

Acceptance: _____
               Kunal Kapai

**353 Indusco Court, Suite C • Troy, Michigan • 48083**
**Phone: 248-588-1781 • Fax: 248-588-1834**
**www.ubtus.com**

# UNIFIED BUSINESS TECHNOLOGIES

## AGREEMENT

This Employment Agreement is effective on January 3, 2012 between Unified Business Technologies, Inc. (UBT the "Company") and **Kunal Kapai** ("Employee") residing at 8727 Isaac Street, Plano, TX 75024.

The Company and the Employee wish to set forth in writing the terms and conditions of the employment of the Employee.

      **NOW, THEREFORE**, the parties agree as follows:

SECTION 1. GENERAL TERMS

      1.1    The Company agrees to employ the Employee as **Sr. Vice President of Operations.** The Employee accepts such employment by the Company on the terms and conditions set forth in this Agreement.  The Employee agrees to serve the Company faithfully in this capacity, the duties and responsibilities of which may change from time to time.

      1.2    The Employee agrees to devote the Employee's entire energy and full and undivided time and attention during the expected working hours of the Employee exclusively to the business of the Company unless the Company otherwise consents in its sole discretion as evidenced by a writing signed by  the Company's President.  The Employee under no circumstances may work for a competitor of the Company.

      1.3    The Employee agrees and represents to the Company that the Employee is not subject to any existing contract which would affect or impede the Employee's ability to perform in accordance with the terms of this Agreement, including, by way of example, any restrictive covenants of past employers that would prohibit the Employee's acceptance of the terms of this Agreement. The Employee agrees not to disclose to the Company any confidential information or trade secrets of others for which he may be under an obligation to a third party not to disclose.  The Employee also agrees not to breach any on-going fiduciary duty still owed to a previous employer nor to appropriate any trade secrets obtained while in the employ of such previous employer.

1.4     The Employee hereby acknowledges that he is in a position of trust in performing services for the Company and its clients, including but not limited to obtaining access to confidential and trade secret information. The Employee represents and warrants that he/she has no criminal felony convictions involving drugs, theft or violent behavior within the past five (5) years. Furthermore, the Employee expressly authorizes the Company or its agents to conduct criminal background checks to verify his/her above-stated representations.

1.5     Company and Employee agree to meet within 12 months of the beginning date of Employee's employment to discuss changes to Employee's title, compensation, and fringe benefits on a mutually agreeable basis.

SECTION 2. COMPENSATION

The Employee's compensation is specified in the Job Offer Letter. The Employee's Compensation is payable in accordance with the customary payroll practices of the Company.

SECTION 3. TERMINATION

3.1     TERMINATION FOR CAUSE
Employer may terminate Employee's employment relationship with Employer for cause, which shall be any one of the following events:
   a. Any material breach of this agreement by Employee, including, for example, Employee's failure to perform duties under this agreement.
   b. Employee has been convicted of a felony of any kind or has acted dishonestly with regard to Employer or Employer's clients.

3.2 TERMINATION WITHOUT CAUSE
   a. Either Employer or Employee may terminate the employment relationship on 30 days' written notice to the other of the desire to end the employment relationship between the parties.
   b. This agreement shall terminate on the dissolution or liquidation of Employer.
   c. This agreement shall terminate on the death or disability of Employee.

SECTION 4. FRINGE BENEFITS

The Employee is entitled to fringe benefits as specified in the Job Offer Letter.

SECTION 5. CONFIDENTIALITY

As part of your employment, you will acquire or develop confidential and proprietary

information concerning the Company and its dealings and method of dealings with its customers, their clients or end users. Also, employees and you will develop relationships of special trust and confidence with the Company's customers, their clients or end users, and employees (collectively "Confidential Matter") You agree that such Confidential Matter is for the Company's exclusive benefit and that, both during your employment and at all times thereafter, you will not directly or indirectly use or disclose any Confidential Matter except for the sole benefit and with the consent of the Company.  Upon the conclusion of your employment, you will promptly return all documents and information (including computer generated or stored matters) concerning the Company or its customers and employees.

The provisions of Section 4 shall survive the Termination of this Agreement.

SECTION 6. NON-COMPETITION DURING EMPLOYMENT.

Employee agrees that for as long as he remains employed by Company, he will devote substantially all of his time, skill, diligence and attention to the Business. Employee further agrees that during such period of employment he will not, directly or indirectly:

6.1.     make any statement or perform any act intended to advance any interest of an existing or prospective competitor of Company that could reasonably be expected to injure Company in its relationship with any existing or potential customer, supplier, employee or creditor of Company;

6.2.     do any act, or solicit or encourage any other employee of Company to do any acts, that is disloyal to Company or inconsistent with Company's interest or in violation of Company's policies;

6.3.     participate in or assist with the formation or operations of, or solicit any other employee to participate in or assist with the formation or operations of, any business that competes with Company or facilitate any discussions with respect to the possible future employment of such other employee by any such business;

6.4.     discuss with any customer of the Business or any existing or potential supplier or creditor of Company that Employee intends to resign, or make any statement or do any act intended to cause any customer or an existing or potential supplier or creditor of Company to learn of Employee's intention to resign; and

6.5.     discuss with any customer or any existing or potential supplier or creditor of Company the present or future availability of services or products provided by a business that competes with Company or, where such services or products are

competitive, with services or products that Company provides.

<u>SECTION 7 NON-COMPETITION DURING AND AFTER EMPLOYMENT.</u>

Employee agrees that during the Employment Term and until the expiration of twelve (12) months following the date that Employee ceases to be employed by Company for any reason, he will not, directly or indirectly, either:

7.1.     have any interest in (whether as founder, proprietor, officer, director or otherwise), enter the employment of, act as agent, broker, licensor or distributor for or adviser or consultant to, or in any way assist (whether by solicitation of customers or employees or otherwise) any individual, partnership, joint venture, corporation or other business entity directly or indirectly engaged in any business or enterprise which directly or indirectly competes with Company in the design, manufacture, sale or distribution of services or other activities engaged in by Company at the time Employee ceases to be employed by Company, to the extent competitive with Company in the markets in which Company operates;

7.2.     solicit, divert or take away, or attempt to solicit, divert or take away any customer or the business of any customer with respect to the products or services of Company sold (or offered for sale) to such customer;

7.3.     attempt to cause any customer to refrain, in any respect, from maintaining or acquiring any product or service provided or offered by Company to such customer;

7.4.     render services to or share in the earnings of or invest in the stock, bonds or other securities of any other entity directly or indirectly engaged in any business or enterprise in competition with the Company's business; provided, however, that Employee may own passive investments of not more than one percent (1%) of the outstanding stock, bonds, or other securities of any similar business (but without otherwise participating in such similar business) if such stock, bonds or other securities are listed on any national stock exchange or are traded and quoted on or the Nasdaq National Market System.

The running of the period during which the restrictions set forth in this section apply will be tolled during the continuance of any breach or violation by Employee of his covenants and agreements contained in this Section, and the period will be extended by the length of time during which any such breach or violation continues.

SECTION 8 NON-SOLICITATION

8.1.    Employee agrees that during the Employment Term and until the expiration of twelve (12) months following the date that Employee ceases to be employed by Company for any reason, Employee will not (i) recruit or solicit any employee or sales agent of Company to discontinue such employment or engagement; seek to employ or retain any such employee or agent; or cause any business, person, firm or corporation which competes directly or indirectly with Company to seek or solicit the employment or retention of any such employee or agent; or (ii) solicit or encourage any person or any business, firm, corporation or other entity which has a business or commercial relationship with Company to seek to discontinue such relationship or reduce the volume or scope of such relationship.

8.2.    Anti-Disparagement. Neither party will make any comments to any individual or entity, including, without limitation, clients, customers, employees, financial or credit institutions, which could be construed as negative or derogatory concerning the other party or their Affiliates. This paragraph does not include pleadings or testimony under oath given in connection with any attempt to enforce the provisions of this Agreement.

8.3.    No Existing Restrictions. Employee represents and warrants to Company that he is not a party to any agreement which would prohibit him from entering into this Agreement or his performing the services required hereunder, or would allow the awarding of damages against Employee or Company arising from this Agreement or Employee's performance of his responsibilities hereunder.

SECTION 9. REMEDIES OF COMPANY

9.1    The Employee acknowledges the restrictions imposed by this Agreement are reasonable and are necessary to protect the legitimate business interests of the Company.

9.2    If the Employee breaches or threatens to breach any of the restrictions imposed by this Agreement, the Employee agrees the Company would suffer irreparable harm for which money would be an inadequate remedy.  Accordingly, the Employee agrees that the Company has the right to obtain injunctive or other equitable relief in addition to any other available remedies and the Company shall have the additional right to recover from the Employee court costs and reasonable attorney's fees incurred by the Company in protection of its interests hereunder.

## SECTION 10. BINDING EFFECT

This Agreement is binding upon, inures to the benefit of and is enforceable by the heirs, personal representatives, successors and permitted assigns of the parties.  This Agreement is not assignable by the Employee.  Nor may the obligations of the Employee be delegated to any person or other entity.  The Company may assign this Agreement without the consent of the Employee to a subsidiary of the Company, to an entity that acquires the Company, to an entity with which the Company merges or to an entity which is acquired by the Company.

## SECTION 11. INVENTIONS, TRADEMARKS, PATENTS AND OTHER WORK PRODUCTS

11.1    Unless otherwise authorized in writing by the Company and to the extent the Employee generates works of authorship, copyrights, inventions, trademarks, trade dress or other such work products dealing with the nature of the Company's business (collectively the "works") during the terms of employment by the Company, or uses the premises, facilities or time of the Company to create or fix the Works, the Employee shall and hereby does convey, assign and transfer ownership to the Company of all right, title and interest in and to all the works throughout the world, including but not limited to any and all copyright, patent, trademark and trade dress rights.  Whenever permitted by law, the Company shall have the exclusive right to obtain copyright, patent and/or trademark registration or other protection in the Works in its own name as inventor, author and owner and to secure any renewals and extensions of such rights throughout the world.

11.2    The Employee hereby acknowledges that the Employee retains no rights whatsoever with respect to the Works, including but not limited to any rights to reproduce the Works, prepare derivative works based thereon, file copyright or trademark applications for the Works, distribute copies of the Works in any manner whatsoever, exhibit, use or display the Works publicly or otherwise, in license or assign to any third party the right to do any of the foregoing, except as otherwise authorized in writing by the Company.

11.3    The Employee agrees to execute any documents as may be reasonably required by the Company to effect the Company's ownership rights as provided herein or to otherwise further the purpose of this Agreement.

11.4    The Company shall be entitled to a shop right with respect to any of the Works created by the Employee that is not assignable to the Company under the terms of this Agreement.  In the event of termination, expiration or invalidation of this Agreement by statutory construction, judicial interpretation or other means, Employee agrees that the Company has absolute rights of first refusal to acquire any remaining portion or extension of the copyright term in the Works.

SECTION 12. AMENDMENTS AND NON-WAIVER

This Agreement, including this Section 12, may only be changed or amended by a written agreement signed by a Company Executive Officer and the Employee.  A waiver by the Company of a breach of any provision of this Agreement by the Employee is not to be construed as a waiver of any other current or subsequent breach.

SECTION 13. ENTIRE AGREEMENT

This Agreement, together with the initial compensation, fringe benefits, and vacation time set forth in the Job Offer letter to which this Agreement is attached, contains the entire understanding of the parties with respect to the matters set forth herein.   Each party acknowledges that there are no warranties, representations, promises, covenants or understandings of any kind except those that are expressly set forth in this Agreement.  This Agreement supersedes any previous agreements between the parties.

SECTION 14. NOTICES

All notices under this Agreement shall be made in writing and shall be deemed given when (1) delivered in person, (2) deposited in the U.S. mail, first class, with proper postage prepaid and properly addressed, or (3) delivered by an overnight or other express delivery service carrier, or (4) sent through the interoffice delivery service of Employer, if the Employee is still employed by the Company at the time.

SECTION 15. GOVERNING LAW AND JURISDICTION

This Agreement is governed by and is to be construed and enforced in accordance with the laws of Michigan as though made and to be fully performed in Michigan (without regard to the conflicts of law rules of Michigan). All disputes arising under this Agreement are to be resolved in the courts of the State of Michigan.  The parties consent to the jurisdiction of the Michigan courts.  The parties agree that the courts of the State of Michigan are to have exclusive jurisdiction over this Agreement.  The parties agree that service of any process is effective if served in the manner that a Notice may be served pursuant to this Agreement.

SECTION 16. ARBITRATION

Any dispute, claim or controversy arising under this Agreement or in connection with your employment with the Company shall be submitted to binding arbitration before the American Arbitration Association in Southfield, Michigan and that a judgment of the Oakland County Circuit Court may be entered upon any award issued by the American Arbitration Association. You agree that you will be responsible for all costs associated with such arbitration, including reasonable attorney fees, if the Company prevails on its claims or defenses in any respect.

SECTION 17. SEVERABILITY

The invalidity or unenforceability of any provision of this Agreement does not in any manner affect any other provision. If any provision is determined to be invalid or unenforceable, this Agreement is to be construed as if the invalid or unenforceable provision was omitted.

SECTION 18. COMPLIANCE WITH LAWS/HOLD HARMLESS/REPRESENTATION

Contractor agrees to comply with all provisions of this Agreement and with all laws and to indemnify, defend and hold harmless UBT, its employees, agents, officers, and directors, from and against any and all claims, liabilities, damages, costs, and/or expenses of whatever kind or nature, including without limit court costs and attorney fees arising out of or related to the failure to so comply other than those claims, liabilities, damages, costs, and/or expenses arising solely from the gross negligence or willful misconduct of UBT. Contractor represents and warrants that all statements contained in Contractor's resume provided to UBT are true and accurate and that all transcripts, diplomas, and affidavits provided to UBT are genuine.

SECTION 19. SURVIVAL

Upon the expiration or termination of this Agreement, the obligations of the parties to each other shall come to an end, except that the provisions of Section(s) 5, 6 and 7 (regarding non-competition and non-solicitation) and Section 4 (regarding confidentiality) shall survive."

**IN WITNESS WHEREOF**, the parties have signed this Agreement.

Dated: 12/27/12                                    By: _____
                                                        Shannon Sturm

Dated: DECEMBER 27, 2012                            By: _____
                                                        Kunal Kapai

 **UNIFIED BUSINESS TECHNOLOGIES**

May 10, 2016

Kunal Kapai

8727 Isaac St.

Plano, TX 75024

Dear Mr. Kapai,

This notice is issued advising that your employment with Unified Business Technologies, Inc. (UBT) is hereby terminated, with immediate effect. You will be paid your normal salary through the date of termination as well as one month salary in accordance with the separation agreement.

You are requested to collect your personal belongings and return all Company property including but not limited to, your keys/fob/access card, laptop computer, etc. immediately.

Should you have questions, please feel free to contact me at 410-703-9037.

Best Regards,

*Michael Grossman*

Michael Grossman

General Counsel